UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

KENNETH BEXTERMUELLER
and DEBRA BEXTERMUELLER,
as owners of a 1997 Sea Ray Bow
Rider 280 motor vessel, for
exoneration from or limitation of
liability,

            Petitioners,

    v.

ALEXANDER EATON,

            Claimant,

Case No.: 2:24-cv-688-SPC-NPM

## OPINION AND ORDER

Before the Court are (1) Petitioners Kenneth and Debra Bextermueller's Motion for Summary Judgment (Doc. 47) and Claimant Alexander Eaton's response (Doc. 52); (2) Eaton's Motion for Summary Judgment (Doc. 48), the Bextermuellers' response (Doc. 50), and Eaton's reply (Doc. 53); and (3) Eaton's Motion to Exclude Certain Opinions from Petitioners' Expert Mr. Thomas Danti (Doc. 49) and the Bextermuellers' response (Doc. 51). For these reasons, the Court denies the motions.

## Material Facts

This is an action in admiralty for limitation of liability. The Bextermuellers, who primarily reside in Arkansas, purchased a unit at the

Paradise Pointe Condominiums in Cape Coral, Florida in April 2012. (Doc. 47 at 4 ¶ 1). In 2016, they purchased a 1997 Sea Ray Bow Rider 280 motor vessel ("Vessel"), which they brought to Florida the next year. (*Id.* ¶¶ 2–4). They visited their condo in spring 2022 and returned to Arkansas at either the end of March or beginning of April. (*Id.* ¶ 5).

On September 23, 2022, at 5:00 a.m., the National Hurricane Center issued its first forecast for the storm that became Hurricane Ian. (*Id.* ¶ 7). The storm made landfall as a category 4 hurricane five days later. (*Id.* ¶ 10). The United States Geological Survey recorded storm surge between seven and eight feet at the Cape Coral Yacht Club, near the Bextermuellers' condo. (*Id.* ¶ 14).

Before returning to Arkansas in spring 2022, the Bextermuellers raised the Vessel on a lift at the Paradise Pointe marina, giving a clearance of six feet between the water and the keel. (*Id.* ¶ 6). The Bextermuellers did not call any other marina, storage facility, or any individual to secure the Vessel on their behalf at any point before the storm. (Doc. 48 at 3–4 ¶ 3). Debra Bextermueller testified that they "didn't think it was necessary." (Doc. 47-2 at 13). According to Kenneth Bextermueller, "by the time we realized that [Hurricane Ian] was going to turn to hit Cape Coral or Fort Myers, there was literally no time to do anything like that." (Doc. 47-1 at 24).

Robert Snow, who designed, built, developed, and resides at Paradise Pointe, remained at his condo during Hurricane Ian. (Doc. 47 ¶ 8). Before the

storm made landfall, Snow inspected the vessels at the Paradise Pointe marina.

Whether the Vessel was secure is a major point of contention. Six boats, including the Vessel, were moored in the marina in anticipation of the storm. (Doc. 47-6 at 21). Snow testified that he affixed ropes to one boat that was rocking or moving more than it should have. (*Id.* at 18). But it was not the Bextermuellers' Vessel. Snow testified that he did not have to do anything to the Vessel, which was "high up on the lift" and "was secured." (*Id.* at 18–19). Although he remembered that the Vessel was high, he could not recall whether it was at the highest possible point on the lift or how many lines were on it. (*Id.* at 19–20, 43–44).

Kenneth Bextermueller testified that they raised the vessel in its cradle on the lift to its maximum height and looped an electrical extension cord from the boat's railing around a marina piling. (Doc. 47-1 at 16). The extension cord was the only line attached to the Vessel and the only thing keeping it on the lift. (*Id.* at 17).

The boats in the marina fared poorly during the storm. Snow testified that the wood piers or access docks between every two boat slips were destroyed. (Doc. 46-7 at 20). Their removal loosened the strength of the pilings that support the piers and other pilings supporting the boatlifts. According to Snow, the surging water destroyed some of the boatlifts and most of the

mooring lines.  Some of the boats floated away.  Two remained in the marina.  One was wedged against the seawall.  Another was "stuffed up" in its upper-most position.  (*Id.* at 21).  Insurance companies totaled every boat left in the marina.

As for the Vessel, it drifted across the Caloosahatchee River and became stranded on Eaton's property.  (Doc. 47 at 6 ¶ 16).  Eaton testified that on September 28, 2022, at 7:00 p.m. he "observed the Bextermuellers' boat traveling across my dock, my yard."  (Doc. 47-8 at 13).  Further, he "saw the boat coming towards our property, passing over where the boat damage occurred and then up onto our—and then, going up onto our lawn and I watched it move slowly across the lawn and slowly up to, and finally stopping just short of our garage during this time."  (*Id.* at 21).  He saw the Vessel, which "appeared to make contact with the pilings on its way across."  (*Id.* at 22).  According to Eaton, the Vessel damaged his dock, irrigation, lighting, and lawn. (Doc. 47 at 6 ¶ 16).

## Procedural History

Eaton filed an action in state court, alleging that the Bextermuellers' boat damaged his dock, boat lift, and property in Hurricane Ian.  *See Alexander Eaton v. Kenneth Bextermueller and Debra Bextermueller*, Case No. 2024-CA-003374 (Fla. 20th Jud. Cir. 2024).  Then, in July 2024, the Bextermuellers filed

this action under the Limitation of Liability Act, 46 U.S.C. § 30501, *et seq.* (Doc. 1).  Eaton filed his Rule 5(f) claim on October 18, 2024.  (Doc. 18).

## Legal Standard

Separate standards govern the motions before the Court.  Beginning with Eaton's *Daubert*[1] motion, Federal Rule of Evidence 702 governs the admissibility of expert testimony.  *Otogenetics, Corp. v. Omega Biosciences, Inc.*, No. 1:15-CV-2697-SCJ, 2017 WL 11580438, at *3 (N.D. Ga. Aug. 7, 2017). It permits an expert to testify if the moving party can show that the expert is "qualified to testify competently regarding the matter" they intend to address, their methodology is "reliable as determined by a *Daubert* inquiry," and their testimony will "assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue." *Castang v. Kim*, No. 1:22-CV-5136-SCJ, 2023 WL 2370961, at *1 (N.D. Ga. Feb. 2, 2023).  The party offering the expert must satisfy these requirements by a preponderance of the evidence.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005).

"In determining the admissibility of expert testimony under Rule 702, [t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Monte v. Sherwin-Williams Dev. Corp.*, No. 6:23-CV-288-JSS-DCI, 2025

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

WL 90119, at *2 (M.D. Fla. Jan. 14, 2025).  This remains true even where the case is proceeding as a bench trial, as here.  *Leger v. Carnival Corp.*, No. 1:24-CV-21364, 2025 WL 1295042, at *3 (S.D. Fla. Feb. 25, 2025).  That said, a court "enjoy[s] extremely broad discretion" in deciding whether to admit expert testimony in this circumstance, *FCOA, LLC v. Foremost Title & Escrow Servs.*, LLC, No. 17-23971-CIV, 2019 WL 387294, at *5 (S.D. Fla. Jan. 30, 2019), since "[t]here is less need for the gatekeeper to keep the gate when [he] is keeping the gate only for himself," *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005).

While the standard is more relaxed, the purpose of the Court's inquiry remains the same: determining whether the expert's opinions "are based on reliable methodolog[ies] and principles," not whether they are correct.  *Castro v. United States*, No. 2:15-CV-378-FTM-38CM, 2016 WL 5942354, at *4 (M.D. Fla. Oct. 13, 2016).  "In other words, challenges to the weight and sufficiency of the expert testimony" are still improper.  *Walters v. Altec Indus., Inc.*, No. 3:01-CV-371J12TEM, 2003 WL 25686829, at *3 (M.D. Fla. Sept. 3, 2003).

Turning to the parties' other motions, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, a judge "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). This is true even where, as here, the case is set for a bench trial. *See F.T.C. v. Direct Benefits Grp., LLC*, No. 6:11-CV-1186-ORL-28, 2012 WL 5430989, at *4 (M.D. Fla. Nov. 7, 2012).

"An issue is genuine if a reasonable [factfinder] could return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at *2 (S.D. Fla. Jan. 25, 2019). And a "fact is material if it may affect the outcome of the case under the applicable substantive law." *Id.*

"The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact." *Desai v. Navigators Ins. Co.*, 400 F. Supp. 3d 1280, 1287 (M.D. Fla. 2019). "If the movant does so, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law." *Id.* "The assertion that a fact is genuinely disputed . . . must [be] supported by particular parts of materials in the record." *Moore v. Eger*, No. 616CV303ORL28GJK, 2017 WL 6367598, at *2 (M.D. Fla. Oct. 20, 2017). "In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* at *3.

## Analysis

**A.   Rule 702 Motion**

Eaton moves to exclude certain opinions of Thomas Danti, the Bextermuellers' maritime and seamanship expert. (Doc. 51). In his report, Danti explains he has experience as a seaman, officer in the merchant marines, commander in the United States Naval Reserve, yacht captain, professor of marine science at Florida Institute of Technology, instructor/dean of Chapman School of Seamanship, and NMC-approved[2] instructor. (Doc. 47-3). He has lived in Florida for over 40 years and experienced several hurricanes. Further, he has developed and implemented the hurricane preparedness plan for Chapman's property and approximately 50 vessels used in the training fleet.

Danti offers these three conclusions in his report:

> A. That the Bextemuellers' action to leave their vessel on the lift during hurricane season was reasonable and within the normal standards of care.
>
> B. That the vessel was secure on the lift in preparation for hurricane season based on past hurricane exposure.
>
> C. There was nothing else they could have done except remove it from the lift and try and find additional storage. Which given the number of vessels on lifts in Florida is unreasonable.

(*Id.* at 13).

Eaton argues that the Court should limit Danti's opinions as follows:

> 1.      Mr. Danti should be precluded from opining on the final location of, or method of securing other vessels in the subject Marina on the date of the subject incident and in the aftermath of the storm, and whether placing mooring

---

[2] NMC is not defined in the report.

lines and straps on the subject Bextermueller vessel would have made a difference.

2.    Mr. Danti should be precluded from opining on the availability of inland storage in March of 2022 when the Petitioners left Florida, or at any time within the six months the Bextermuellers had to move their vessel both before and during hurricane season before this storm.

3.    Mr. Danti should be precluded from opining whether the Bextermueller vessel which ended up plowing through Mr. Eaton's property causing damage to Mr. Eaton's yard, landscaping, and irrigation, also caused the damage to Mr. Eaton's dock.

(Doc. 49 at 2).  He contends these matters are not within Danti's field, are not researched, and are based on speculation.  The Court addresses each issue in turn.

First, Danti's opinions concerning whether additional mooring lines would have made a difference.  Danti based his opinion on a video of the marina from condominium owner Robert Snow and Snow's deposition testimony.  In Eaton's view, Danti merely speculates that the Vessel would have broken free regardless of whether mooring lines were used to secure it to the cradle.  According to Eaton, this opinion is based on speculation, hearsay upon hearsay, and a lack of knowledge as to what steps other vessel owners nearby took to secure their vessels.  In short, he believes the opinion is unreliable and unhelpful to the trier of fact.

Despite these arguments, the Court will not exclude this opinion.  "Expert testimony is helpful to the trier of fact if it concerns matters that are

9

beyond the understanding of the average layperson." *AM Grand Ct. Lakes, LLC v. Rockhill Ins. Co.*, No. 18-CV-23576, 2019 WL 13216296, at *5 (S.D. Fla. Sept. 11, 2019). Danti intends to offer testimony about how the Bextermuellers stored the Vessel on the lift, the impact of the storm surge, and proper storage on a lift. These matters are beyond the understanding of the average layperson, and his testimony, which will draw on the qualifications and expertise discussed above, will assist the Court in better understanding the evidence and merits. *See Castang v. Kim*, No. 1:22-CV-5136-SCJ, 2023 WL 2370961, at *1 (N.D. Ga. Feb. 2, 2023).

The Court also finds that the opinion is sufficiently reliable. Here, Danti considered Snow's photographs and videos showing the condition of the marina and vessels, witness testimony, information from the Bextermuellers regarding securing the Vessel before other hurricanes, and his own experience in maritime safety. "What evidence an expert did, or did not, consider generally affects the weight of their testimony, not its admissibility." *Toca v. Debonair Props. LLC*, No. 2:23-CV-303-KCD, 2025 WL 2106674, at *4 (M.D. Fla. July 28, 2025) (citing *Kang v. Mayor & Aldermen of City of Savannah*, No. CV421-111, 2024 WL 150082, at *5 (S.D. Ga. Jan. 12, 2024)); *Action Nissan, Inc. v. Hyundai Motor Am.*, No. 618CV380ORL78EJK, 2020 WL 9173027, at *2 (M.D. Fla. Nov. 5, 2020) ("To the extent that Plaintiffs argue that [the expert's] opinions should be excluded because he failed to consider certain facts

10

or evidence, their attacks go to weight, not admissibility."); *Rollins v. Mr. Heather, Inc.*, No. 1:16-CV-01834-JEO, 2018 WL 11454741, at \*6 (N.D. Ala. Sept. 11, 2018) ("The inquiry for the court is merely whether [the expert's] opinion is supported by sufficient, not necessarily all, facts.  Any alleged weaknesses in [his] methodology regarding the above goes to the weight of his testimony, not its admissibility.")).  Accordingly, the Court rejects Eaton's first challenge to Danti's proposed testimony.

Next, Danti's opinions regarding the availability of inland storage before Hurricane Ian.  Eaton argues that Danti admits he has no knowledge as to storage options available to the Bextermuellers.  (Doc. 49 at 7–8).  Further, Danti purportedly has no methodology or factual basis to reliably opine on the feasibility of inland storage.  As a result, Eaton contends his testimony on this issue is not helpful or trustworthy and should be precluded.

This opinion is a somewhat closer call.  Among other things, in Danti's report, he states that he "doubt[s] there are ample empty storage facilities that could accommodate all the vessels on lifts in . . . Florida." (Doc. 47-3).  He also testified that he does not know what storage was available in March 2022. (Doc. 47-11 at 109).  These feeble statements do not inspire great confidence in his conclusions on this point.

But on balance, the Court finds that his opinions should not be excluded. His opinions are grounded in his firsthand experience as an owner and

11

operator of a vessel storage facility in Naples, Florida. He also is aware of storage units in the area that Hurricane Ian damaged. The Court agrees with the Bextermuellers that Danti may present opinions regarding the logistical difficulties with Eaton's theory that they should have moved the Vessel from the lift to storage. In sum, Eaton's objections go to the weight, not the admissibility, of the evidence.

Finally, Danti's opinions regarding whether the Vessel damaged Eaton's dock. Eaton argues that Danti's opinion is based only on photos, he is not a marine surveyor, he does not have disclosed experience in dock construction, he never went to Eaton's property to view the damage, and he never examined the Vessel. Thus, Eaton asserts that there is no methodology to Danti's opinion that the Vessel did not damage his dock.

Preliminarily, the Court disposes of some of these arguments. Eaton repaired the dock three years before Danti wrote his report, and the Vessel was salvaged before the Bextermuellers filed this action. So Danti could not have viewed evidence that did not exist when he reached his opinions. Rather, Danti's opinions are based on evidence of the Vessel's post-storm condition and the dock's pre-storm condition. Based on his review of the photographic evidence and his experience, Danti concluded that the Vessel did not exhibit damage consistent with an impact to Eaton's dock.

12

"[A]n expert need not be an eyewitness in order to give an expert opinion." *Banta Props., Inc. v. Arch Specialty Ins. Co.*, No. 10-61485-CIV, 2011 WL 7139154, at *2 (S.D. Fla. Dec. 23, 2011) (citing *Daubert,* 509 U.S. at 592 ("Unlike an ordinary witness, *see* Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.")).  Like Eaton's other arguments, the Court finds that they go to the weight, rather than the admissibility, of Danti's opinions.

Therefore, the Court denies Eaton's Rule 702 motion in its entirety.

## B.    Cross Motions for Summary Judgment[3]

"Admiralty and maritime law includes a host of special rights, duties, rules, and procedures." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 446 (2001).  Among them is the Shipowner's Limitation of Liability Act, which allows a vessel owner to seek "both exoneration from, and limitation of, liability for maritime accidents." *In re Skanska USA Civ. Se. Inc.*, 577 F. Supp. 3d 1302, 1313 (N.D. Fla. 2021).

Maritime torts are reviewed under a two-step analysis.  First, to answer the exoneration question, the Court determines what acts of negligence, if any, caused the accident.  *Beiswenger Enters. Corp. v. Carletta*, 86 F.3d 1032, 1036 (11th Cir. 1996).  Liability is established only where the vessel owner's

---

[3] For efficiency, the Court takes the legal standards in this section nearly verbatim from *Toca*, 2025 WL 2106674, at *5, a notably similar admiralty case in the Fort Myers Division.

negligence was a contributory and proximate cause of the accident. If the shipowner is free from any fault, he is exonerated from all liability. *See Am. Dredging Co. v. Lambert*, 81 F.3d 127, 129 (11th Cir. 1996). But if negligence at least partly produced the accident, the Court proceeds to the second step, limitation of liability, and determines whether the vessel owner had knowledge of, or was in privity with, the acts of negligence.

Generally, the burden of establishing negligence at this stage would fall on Eaton as the claimant. *See In re Honeycutt*, No. 8:05CV439T27MSS, 2006 WL 2792890, at *4 (M.D. Fla. Sept. 27, 2006). However, when a vessel is "moving or drifting due to an external force, such as the current or the wind," and it "allides with a stationary object, the moving vessel is presumptively at fault." *Fischer v. S/Y Neraida*, 508 F.3d 586, 593 (11th Cir. 2007). This presumption "derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the moving vessel is mishandled in some way." *Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919, 923 (11th Cir. 2001).

To overcome this presumption, the Bextermuellers, as the owners of the Vessel, must disprove their fault by a preponderance of the evidence. *Liberty Surplus Ins. Corp. v. Patriot Asphalt, LLC*, No. CIV.A. 06-0456-WSM, 2009 WL 455600, at *2 (S.D. Ala. Feb. 20, 2009). Several paths are available; they may show: "(1) that the allision was the fault of the stationary object; (2) that the

14

moving vessel acted with reasonable care; or (3) that the allision was an unavoidable accident." *Hatt 65, L.L.C. v. Kreitzberg*, No. 3:06CV332-MCR/EMT, 2009 WL 3163220, at *7 (N.D. Fla. Sept. 30, 2009).

### 1. Bextermuellers' Motion for Summary Judgment

In their motion, the Bextermuellers do not contend that Eaton was at fault. Instead, they argue that they took reasonable care to secure their Vessel, that Eaton has not shown their Vessel caused his damages, and regardless, the collision was ultimately an unavoidable accident caused by an act of God. Despite their arguments, factual disputes preclude summary judgment in the Bextermuellers' favor.

First, there is a genuine issue of material fact regarding whether the Bextermuellers' conduct met the standard of care. The Bextermuellers argue that they took all reasonable measures under the circumstances. (Doc. 47 at 10). Their expert, Danti, concludes as much. (Doc. 47-3 at 13).

But Eaton identifies evidence from his expert, Craig Starns, who was retained to opine on "the safety and security of the docking arrangement where the vessel was during the hurricane." (Doc. 47-10 at 26). Specifically, Starns concluded that "there was inadequate advance preparation, no intention or effort made to prevent the loss of the vessel in a hurricane based on the collusion that it hadn't happened before." (*Id.* at 29). In Starns' opinion, the Bextermuellers "acted unreasonably in preparing their vessel and storing it

15

when they left Florida at the end of March of 2022." (*Id.*). These factual disputes concern whether the Bextermuellers should have done more to secure their Vessel than loop an electrical extension cord around the piling and whether they should have tried to move the Vessel to dry storage, among other things. On this record, the Court finds genuine issues of material fact exist concerning whether the Bextermuellers acted with reasonable care.

Next, the Bextermuellers also argue that any negligence "in securing their vessel was not a contributing cause of Claimant's damages because the Act of God would have produced the same damage irrespective of the negligence." (Doc. 47 at 17 (citing *Warrior & Gulf Navigation Co. v. United States*, 864 F.2d 1550, 1553 (11th Cir. 1989)). They argue that they did not have an available alternative storage location, nor did the hurricane provide Southwest Florida with "ample warning" about its approach. (*Id.* at 19). Further, they emphasize that Hurricane Ian destroyed every marine structure in the Paradise Pointe marina and unmoored every vessel. As such, they contend that no precaution they might have taken would have mitigated Hurricane Ian's effects—short of removing the Vessel from Cape Coral, an option they characterize as "neither reasonable nor logistically practical." (*Id.*).

At this juncture, the Court rejects this argument. As Eaton highlights, there are genuine issues of material fact regarding whether mooring the Vessel in a different manner would have made a difference. (Doc. 52 at 11). There is

16

evidence that some vessels in the Paradise Pointe marina did not float away even though the hurricane destroyed the pilings.  Additionally, the parties dispute the feasibility of moving the Vessel inland.  Thus, the Court finds that these factual disputes preclude summary judgment on this point.

Finally, the Court addresses the Bextermuellers' contention that Eaton fails to produce evidence establishing the Vessel proximately caused his damages.  (Doc. 47 at 20).  They argue Eaton has not offered evidence proving the Vessel even made contact with the dock and that his deposition testimony that he saw the Vessel "bouncing around" in the area of the dock and "pass over the area" does not suffice.  (*Id.* at 21).  Additionally, they underscore that Eaton's expert, Robert Stalvey of Coastal Irrigation, does not attribute any of his repairs to Eaton's irrigation, lighting, and lawn to the Vessel running aground on Eaton's lawn.  (*Id.* at 22–23).

Yet again, the Court rejects this argument at the summary judgment stage.  Eaton has presented evidence that he observed the Vessel pass over the dock and apparently make contact with the pilings.  Eaton has produced evidence that the Vessel ended up on his lawn.  The Court cannot weigh conflicting evidence at this stage. *Anderson*, 477 U.S. at 249.  Accordingly, a factual dispute exists concerning whether the Vessel caused the damage.

Therefore, the Court denies the Bextermuellers' motion for summary judgment.

17

*2. Eaton's Motion for Summary Judgment*

The Eleventh Circuit in *Skanska USA Civil Southeast Inc. v. Bagelheads, Inc.* explained that the Limitation Act "limits the liability of vessel owners who were not in some sense responsible for the specific negligent acts or conditions of unseaworthiness that caused the accident." 75 F. 4th 1290, 1304 (2023). Pointing to *Skanska*, Eaton asks this Court to find that the Bextermuellers' knowledge of the alleged negligent acts constitutes legal privity that defeats their ability to bring this action.

The Court declines to do so. The procedural posture of the only post-*Skanska* case Eaton cites for support was a motion for default judgment against non-appearing claimants. (Doc. 53 at 2–3 (citing *In re Petition of John & Brunna Cornell*, No. 8:24-CV-00900-SDM-NHA, 2025 WL 3197638, at \*7 (M.D. Fla. Oct. 29, 2025), *report and recommendation adopted sub nom. In re Cornell*, No. 8:24-CV-900-SDM-NHA, 2025 WL 3192187 (M.D. Fla. Nov. 14, 2025))). In *Cornell*, the court noted that "Petitioners' well-pleaded facts establish it could have been free from negligence and from privity or knowledge with any negligent act." *Id.* at \*8. While that may have been true in *Cornell*, this case is replete with factual disputes, which the Court explained above. Accordingly, the Court will not "skip a step" and make findings as a matter of law on this record.

18

Similarly, for the reasons explained above in connection with the Bextermuellers' motion, the Court finds factual disputes preclude summary judgment on Eaton's other negligence-related arguments. In sum, the Court denies Eaton's summary judgment motion.

Accordingly, it is now:

**ORDERED:**

1. The Bextermuellers' Motion for Summary Judgment (Doc. 47) is **DENIED**.

2. Eaton's Motion for Summary Judgment (Doc. 48) is **DENIED**.

3. Eaton's Motion to Exclude Certain Opinions from Petitioners' Expert Mr. Thomas Danti (Doc. 49) is **DENIED**.

4. The Court **REFERS** this case to a settlement conference with United States Magistrate Judge Douglas N. Frazier.

5. The Court **VACATES** all remaining deadlines in the Case Management and Scheduling Order (Doc. 31). The deadlines will be reset under separate cover. [4]

---

[4] The Court's docket has been overwhelmed by several hundred habeas petitions from detainees at the immigration detention facility known as Alligator Alcatraz. These cases and the motions filed in them are time-sensitive and require prompt attention. This onslaught of cases and the heavy burden they place on the Court make it virtually impossible to determine when the Court might be able to try this case. The Court strongly encourages the parties to consent to the United States Magistrate Judge to try this case if it does not settle. Of course, the parties are free to withhold consent without adverse substantive consequences. Fed. R. Civ. P. 73(b)(2).

**DONE and ORDERED** in Fort Myers, Florida on April 21, 2026.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record